IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IVER P. COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action Number: 05-2252 (EGS) |
| ) | |
| U.S. DEPARTMENT OF THE NAVY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION

Plaintiff filed a Freedom of Information Act request with the Department of Navy on May 25, 2004 seeking copies of 30 slides presented by Professor David Liu at a by invitation-only, closed door, confidential presentation of Naval grant recipients. Defendant denied plaintiff's request on February 1, 2005. Plaintiff appealed on April 1, 2005 and defendant denied the appeal on August 5, 2005, releasing copies of only 4 of the 30 slides.

II. FACTS

Defendant respectfully refers the Court to the Statement of Material Facts Which Are Not in Genuine Dispute filed herewith.

### III. STANDARD OF REVIEW

In 1986, the Supreme Court issued three opinions that clarified the standards governing consideration of motions for summary judgment under Fed. R. Civ. P. 56. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex at 322; Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995); Molerio v. FBI, 749 F.2d 815, 823 (D.C. Cir. 1984). Where no genuine dispute exists as to any material fact, summary judgment is required. Anderson, 477 U.S. 242 (1986).

A genuine issue of material fact is one that could change the outcome of the litigation. Id. at 247. The party moving for summary judgment need not prove the absence of an essential element of the nonmoving party's case. Celotex, at 325. "The burden on the moving party may be discharged by 'showing' – that is, pointing out to the (Court) – that there is an absence of evidence to support the non-moving party's case." Id. Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial. Matsushita, 475 U.S. at 586. Fed. R. Civ. P. 56 requires that the party opposing summary judgment go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Banks v. C & P Tel. Co., 802

F.2d 1416 (D.C. Cir. 1986).  To avoid summary judgment, the Plaintiff must state specific facts or present some objective evidence that would enable the court to find an entitlement to relief.

In an opinion issued the same day as Celotex, the Supreme Court explained the circumstances where summary judgment is appropriate: "if the evidence is merely colorable . . . or is not sufficiently probative . . . summary judgment may be granted . . . (T)he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  Unsupported speculation is not enough to defeat a summary judgment motion; the existence of specific material evidentiary facts must be shown.  Fed. R. Civ. P. 56(e) (the nonmoving party may not rest on mere allegations but "must come forward with 'specific facts showing there is a genuine issue for trial.").  See also Hayes v. Shalala, 902 F.Supp. 259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere unsupported allegations or denials); Johnson v. Digital Equip. Corp., 836 F.Supp. 14, 18 (D.D.C. 1993) (evidence that is merely colorable or not sufficiently probative is insufficient to defeat summary judgment); Baton v. Powell, 912 F.Supp. 565, 578 (D.D.C. 1996).

The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  See Anderson, 477 U.S. at 247-248.  Perhaps most significantly, the Court authorized some weighing of the evidence at the summary judgment stage of litigation, stating that the "purpose of summary judgment is to 'pierce the pleadings, and to assess the proof in order to see whether there is a need for a trial.'" Id. (citation omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party." Id. at 249-250 (citations omitted). If the evidence is "merely colorable, or is not significantly probative," or the record taken as a whole could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." Id.; Matsushita, 475 U.S. at 587.

Thus, the non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," (Matsushita at 586), or with "conclusory allegations . . . unsubstantiated assertions, . . . or a scintilla of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Importantly for this case, "[b]y pointing out the absence of evidence to support the nonmoving party's case, the moving party can demonstrate that there is no genuine issue as to any material fact, therefore entitling it to summary judgment." Shelborne v. Runyon, 1997 WL 527352 at **3, *citing* Celotex, 477 U.S. at 325.

In Celotex, the Supreme Court further instructed that the "(s)ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (*quoting* Fed.R.Civ.P. 1). A court should grant summary judgment if the moving party submits affirmative evidence that negates an essential element of the nonmoving party's claims or by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. Celotex, 477 U.S. at 331.

### IV. ARGUMENT

**A. Exemption 3**

The agency correctly invoked Exemption 3 to withhold the slides at issue. Exemption 3 allows agencies to withhold records "specifically exempted from disclosure by statute," provided

the statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding, or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). To invoke the Freedom of Information Act, 5 U.S.C. § 552(b)(3), exemption, an agency must demonstrate that: (1) a statute exists and was in effect at the time of the request; (2) the statute either requires that matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (3) the records in question are among those covered by the statute. Public Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280 (D.C. Cir. 1983).

One such exempting statute is 35 U.S.C. § 205. That statute authorizes Federal agencies to withhold "information disclosing any invention in which the Federal Government owns or may own a right, title, or interest (including a non-exclusive license) for a reasonable time in order for a patent application to be filed." Id. The Government may own a right, title, or interest in inventions stemming from research it has funded. See 35 U.S.C. § 202(c)(3)-(4). Also, agencies cannot "be required to release copies of any document which is part of an application for patent filed with the United States Patent and Trademark office or with any foreign patent office." 35 U.S.C. § 205.

Under 37 C.F.R. § 401.13(c)(1) and (2), "[t]o the extent authorized by 35 U.S.C. § 205, agencies shall not disclose to third parties pursuant to requests under the Freedom of Information Act (FOIA) any information disclosing a subject invention for a reasonable time in order for a patent application to be filed." And, "[i]n accordance with 35 U.S.C. § 205, agencies shall not disclose for a period of 18 months from the filing date of the patent application to third parties

5

pursuant to the Freedom of Information Act, or otherwise, copies of any document which the agency obtained under this clause which is part of an application for patent with the U.S. Patent and Trademark office or any foreign patent office. . ."

The slide presentation requested reflects research that the Office of Naval Research (ONR) funded under grant N00014-00-1-0596. *See* Exhibit 2; Liu Decl. (2004) ¶13[1]. The information described in the withheld slides disclose one or more inventions, which were developed through the research funded by the ONR grant. Attachment A to Exhibit 1 (Final Agency Decision). Therefore the Federal government does own or may own a right, title or interest in that invention. Furthermore, the information described in slides 21 and 26 has not been contained within a patent application filed to date, though it may in the near future become the subject of one or more patent applications.[2] Attachment A to Exhibit 1 (Final Agency Decision). Accordingly, these two slides are exempt from disclosure under FOIA Exemption 3.

**B. Exemption 4**

The agency correctly invoked Exemption 4 to withhold the slides at issue. FOIA Exemption 4 protects "trade secrets and commercial or financial information obtained from a person, [that is] privileged or confidential. 5 U.S.C. § 552(b)(4). This exemption is intended to protect both the interests of entities that submit proprietary information to the government and the interests of the government in receiving continued access to such data. A two-part test for

---

[1] Declaration was originally submitted to the Department of the Navy as part of the administrative process. Referenced attachments have not been included as they are nor televant to the determination at issue.

[2] Exemption 3 no longer applies to the remaining slides as the patent applications containing the information have published.

determining whether commercial or financial information is "confidential" was set out in National Parks & Conservations Association v. Morton, 498 F2d 765, 770 (D.C. Cir. 1974) whereby "commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future, or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Id.

In its en banc decision in Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992), the Court of Appeals for this Circuit subsequently established two distinct standards to be used in determining whether commercial or financial information submitted to an agency is "confidential" under Exemption 4. For information "voluntarily" submitted to the government, a new test was announced in the decision, such information is categorically protected provided it is not "customarily" disclosed to the public by the submitter. For information that is "required" to be submitted to the government, the test for confidentiality continues to be the one set forth in National Parks & Conservation Association v. Morton, *supra*. The slides at issue here, however, are exempt from disclosure under either the competitive harm test of National Parks or the voluntarily submitted test of Critical Mass.

The information included on these slides is exempt from disclosure under Exemption 4 because (1) it contains trade secret and commercial information, (2) it was voluntarily submitted to the ONR, and (3) it is not customarily disclosed to the public. Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992), cert. denied, 113 S.Ct 1579 (1993). In determining whether an information submission is mandatory or voluntary, the Court of Appeals for the D.C. Circuit has established an objective test. The Court held that "actual legal authority, rather than

parties' beliefs or intentions, governs judicial assessments of the character of submissions." Center for Auto Safety v. National Highway Traffic Safety Administration, 244 F.3d 144, 149 (D.C. Cir. 2001). Information is considered "required" if any legal authority compels its submission, including informal mandates that call for the submission of the information as a condition of doing business with the government. All other information is considered "voluntary" for purposes of Exemption. Lepelletier v. FDIC, 977 F. Supp. 456, 460 (D.D.C. 1997) (Reversed, in part, on other grounds 164 F.3d 37 (D.C. Cir. 1999)).

The slide presentation at the Coolfont meeting was voluntarily provided. The submitter in this case, Professor Liu, is a Professor of Chemistry at Harvard University and is the scientific founder of a company called Ensemble Discovery Corporation ("Ensemble"). Exhibit 2 ¶ 11. With help from an ONR research grant, he developed information with commercial value. At least part of this information is described on the slides he presented at the Coolfont IV meeting. This slide presentation was not a requirement under his grant agreement. Bright Declaration ¶ 13 (Exhibit 3). The only report required to be filed by Professor Liu was a final technical report, filed on August 4, 2003. Exhibit 3. ¶ 13. The Navy had no legal authority to compel disclosure of the slide presentation.

Professor Liu's slide presentation at the Coolfont IV Meeting is not the type of information that he would customarily disclose to the public. *See* Exhibit 2 ¶ 9. As noted, Exemption 4 of the FOIA protects commercial or financial information voluntarily submitted to the Government, provided the information is "of a kind" that the submitter would not customarily release to the public. This custom is determined from how the submitter, and not the industry as a whole, would treat the information. Critical Mass, 975 F.2d at 879; *See also* Center

for Auto Safety v. Nat'l Highway Traffic Safety Administration, 244 F.3d 144, 149 (D.C. Cir. 2001).

The Coolfont meeting was a private event for ONR grantees. Attendance was by invitation only. Before sharing his slide presentation, Professor Liu sought, and received, assurances from Coolfont organizers that its confidentiality would be protected.  Exhibit 2 ¶ 5-7; Exhibit 3 ¶ 10.   Professor Liu relied on these assurances.  Exhibit 2 ¶ 9.  As further evidence of his intentions, Professor Liu marked his presentation "confidential."  Exhibit 2 ¶ 7.  Professor Liu's steps to ensure confidentiality show that he did not intend it to be a public disclosure and the information is a kind that he would not customarily disclose.

The withheld information also meets the stricter National Parks test.  Under the National Parks test, commercial or financial information is considered to be confidential for purposes of Exemption 4 if disclosure of the information is likely to have either of the following effects: "(1) to impair the government's ability to obtain necessary information in the future or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  498 F.2d at 770.   In order to bring a matter (other than a trade secret) within the orbit of FOIA Exemption 4, it must be shown that the information is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential.  Nat'l Parks & Conserv. Assoc. v. Morton, 498 F.2d 765 (D.C. Cir. 1974).  The term "trade secrets" in Exemption 4 of the FOIA, is defined as a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort. Public Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1288 (D.C. Cir. 1983).

Information failing to meet the definition of trade secret, may still be protected by Exemption 4 if it is commercial or financial information. Unlike "trade secret," the term "commercial information" is broad with the words given their ordinary meaning. Public Citizen Health Research Group v. Food & Drug Admin., 704 F.2d at 1290. "Commercial information" includes not only information that reveals basic commercial operations but also information in which the submitter has a "commercial interest". Id. at 1290.

The slides presented by Professor Liu at the Coolfont IV meeting on November 11, 2000 contain extremely sensitive and valuable commercial information. Exhibit 2 ¶ 8, ¶ 13. The Office of Naval Research received this information from Professor Liu only in connection with the Coolfont IV meeting. In particular, Professor Liu's slides describe (i) the concept of nucleic acid mediated organic syntheses together with its advantages over traditional organic syntheses, (ii) suitable chemical reagents, (iii) reaction schemes and reaction conditions for performing nucleic acid mediated organic synthesis, (iv) results from certain experiments performed in Professor Liu's laboratory, and (v) certain dates, including the date of the Coolfont IV meeting. Exhibit 2 ¶ 8.

The slide presentation, in essence, provides a critical linkage between a date and what information had been conceived and/or reduced to practice on that date. Specifically, Professor Liu's slide presentation demonstrates the features of nucleic acid mediated organic syntheses that Professor Liu had conceived and/or reduced to practice by November 11, 2000. This information was and is still a trade secret. Exhibit 2 ¶ 13, Liu Decl. (2005) ¶ 5 (Exhibit 4)[3]. For the reasons

---

[3] Originally submitted in response to plaintiff's administrative appeal. Referenced attachments have not been included as they are nor televant to the determination at issue.

discussed below, this information is extremely sensitive commercial information and would be valuable to anyone with a competing patent application pending at the United States Patent and Trademark Office (the "USPTO").

As a leading treatise on patents explains:

> The basic rule of priority of invention is that the first person who reduces the subject matter in question to practice--either actually or constructively--is the first inventor. The rule is subject to one important exception. The first person to conceive the subject matter in question is the first inventor provided he exercises reasonable diligence in reducing to practice from a time just prior to when the first person to reduce to practice enters the field.
>
> The rule and its exception recognize the importance of both <u>conception</u> and <u>reduction to practice</u> as steps in the inventive process. Conception is important because invention is primarily a mental operation - the perception of a new means for achieving a useful result. After a complete conception of the invention, reduction to practice is by definition a matter of mechanics requiring only ordinary skill in the relevant art. Nevertheless, reduction to practice is important both as verification that the conceived invention is workable and a step in putting the conceived subject matter in a form that will make it a permanent part of the art.

3A-10 Chisum on Patents § 10.03 (emphasis added). The date that an inventor has conceived of an idea and the date that the inventor reduces the idea to practice are critically important in determining priority of inventions. The United States is unusual in having a patent system that awards patents to the first to invent rather than the first to file a patent application. In other words, in the United States, patents are awarded to the party who made an invention first not who filed its patent application first. Priority is awarded based on the dates that an inventor <u>conceived</u> and <u>reduced his or her invention to practice</u>.

Patent interferences are administrative proceedings instituted at the USPTO before the Board of Patent Appeals and Interferences (the "Board") where the Board resolves the question

11

of priority of invention between two or more parties claiming to have made the same patentable invention. See 35 U.S.C. § 135. Once the winner is determined by the Board, the USPTO then grants a patent to the winner.

Following the November 2000 Coolfont IV meeting, Harvard University filed a number of patent applications relating to research that had been performed in Professor Liu's laboratory directed to nucleic acid mediated organic syntheses. Exhibit 2 ¶12. Some of the work presented at the confidential Coolfont IV meeting was included in the patent applications. Id. The patent applications included, among others, a U.S. patent application, Serial No. 10/101,030, filed March 19, 2002, and entitled "Evolving New Molecular Function." Id.

Professor Liu's company, Ensemble, is a start-up company with one or more competitors in the field of nucleic acid mediated organic synthesis. Nuevolution A/S ("Nuevolution") is one of Ensemble's competitors. Exhibit 4 ¶ 4. Iver P. Cooper, the plaintiff/requestor in the pending law suit, is a patent attorney and has been filing and prosecuting patent applications on Nuevolution's behalf.

In view of the value of Professor Liu's inventions in the field of nucleic acid mediated organic syntheses and the scope of the inventions being claimed in both Harvard's and Nuevolution's patent applications, it is possible that one or more of Professor Liu's U.S. patent applications, including the one listed above, and one or more of Nuevolution's patent applications will become involved in a patent interference proceeding at the USPTO. *See* Exhibit 4 ¶ 4 .

One of the Patent Statutes governing patent interference practice states that, a person shall be entitled to a United States patent unless "during the course of an interference conducted under

section 135 or section 291, another inventor involved therein establishes … that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed.… In determining priority of invention under this subsection, there shall be <u>considered not only the respective dates of conception and reduction to practice of the invention</u>, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." 35 U.S.C. § 102 (g) (emphasis added).

It is clear from the language of this statute that the respective dates of conception and reduction to practice are key to the outcome of a patent interference. Attached is a copy of an excerpt from the Manual of Patent Examining Procedure, Eighth Edition (Incorporating Revision No. 4) issued by the U.S. Department of Commerce (the "MPEP") to assist patent examiners at the USPTO. Section 2138.01 of the MPEP makes clear the importance of the dates of conception and reduction to practice, and also provides four examples showing how priority of invention is awarded under different scenarios.

In United States patent practice, therefore, the dates of conception and reduction to practice are key dates, and patent applicants, understandably take great efforts to preserve the confidentiality of these dates. This is exactly the type of information that Professor Liu's slides reveal. It would be unfair to make available to the public the content of Professor Liu's slides as it effectively provides a date stamp (i.e., November 11, 2000) on what Professor Liu had conceived and reduced to practice at least by the time of the Coolfont IV Meeting. Exhibit 2 ¶ 13. According to Professor Liu, this was and still is his confidential information. Exhibit 2 ¶ 13, Exhibit 4 ¶ 5. Furthermore, this is the type of information that the Board considers when trying to

determine who was the first party to make an invention and, therefore, which party should be awarded a United States patent.

Although this type of information eventually becomes available for consideration by the Board while adjudicating the patent interference, the opposing sides typically do not become aware of their opposing party's proofs for showing the respective dates of conception and reduction to practice until after an interference has been declared. For example, one of the first procedural steps in a patent interference is for the opposing parties to serve on the other party and file with the Board Priority Statements stating the earliest dates of conception and reduction to practice each party plans to rely on. *See* 37 C.F.R. §41.204(a). A party cannot submit evidence on the issue of priority unless it submits a Priority Statement, and the party is locked into the dates provided in its Priority Statement. The subject matter contained within Professor Liu's slides is exactly the type of information that an opponent in a patent interference proceeding would like to know before entering into a interference. For example, knowledge of the other party's dates of conception and reduction to practice provides a party with target dates to beat when it prepares its own Priority Statement.

Release of the dates by which Professor Liu had already conceived and/or reduced to practice his inventions would not only aid a competitor in determining whether to provoke a patent interference but also allow the competitor to adjust the date they claim to have conceived their invention and had reduced it to practice. The divulgence of the content of Professor Liu's slide presentation from November 11, 2000 would provide his competitors and his company's competitors (for example, Nuevolution) with a competitive advantage over him and his company. Exhibit 2 ¶ 13, Exhibit 4 ¶ 5. Accordingly, this information would provide his competitors with

-as yet- secret dates that must be beaten in order to prevail in a patent interference. Because comparable, reciprocal information customarily is not available at this time, a premature disclosure of this type of information would place Professor Liu and his company at a significant procedural disadvantage as this would provide Professor Liu's opponent with information to help the opponent fashion its case and to maximize its chances of prevailing in an interference. Accordingly, the disclosure to third parties of what Professor Liu had conceived and reduced to practice as of the date of the Coolfont IV meeting, would, therefore, place Professor Liu and his company at a significant competitive disadvantage relative to their competitors. Id.

In addition to the competitive harm caused to Professor Liu (the submitter), release of the information at issue would impair the government's ability to obtain necessary information in the future. The mere prospect of this type of information being releasable under the FOIA has led researchers to express doubts about attending future conferences. Exhibit 3. ¶ 15. Actual release of this confidential commercial information will "seriously damage the ability of the U.S. Navy... to obtain the reliable flow of high quality information necessary to continue developing improved technologies for its mission." Exhibit 3. ¶ 15.

## V.  CONCLUSION

The information withheld by the Navy is confidential commercial information exempt from disclosure under Exemption 4 of the FOIA. Not only was the information voluntarily provided and not customarily released by the submitter, it also satisfied the more stringent requirements of National Parks as release would both cause substantial competitive harm and impair the government's ability to obtain the information in the future. Additionally, two of the

slides are exempt under Exemption 3, as the information may be part of a patent application for an invention which the government owns or may own an interest. As such summary judgment should be granted the Government.

                              Respectfully submitted,

_____
KENNETH L. WAINSTEIN., D.C. Bar #451058
United States Attorney

_____
RUDOLPH CONTRERAS D.C. Bar No. 434122
Assistant United States Attorney

_____
KEVIN K. ROBITAILLE
Special Assistant U.S. Attorney
555 Fourth Street, N.W., 10th Floor
Washington, D.C. 20530
(202) 353-9895

OF COUNSEL:
Luis P. Leme
Office of Naval Research (Code 00CC)
One Liberty Center
875 N. Randolph Street, Suite 1425
Arlington, VA 22203-1995