# Exhibit B

# KING & SPALDING LLP

1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
Main: 202-737-0500
Fax: 202-626-3737
www.kslaw.com

James D. Miller

Tel: 202-626-2902
jmiller@kslaw.com

April 1, 2005

General Counsel of the Navy
720 Kennon Street, S.E.
Room 214
Washington Navy Yard
Washington, D.C. 20374-5012

Re:   Freedom of Information Act Appeal
      5720
      Ser BDCC/007

Dear Sir/Madam:

This letter and the enclosed memorandum serve as the appeal of the Freedom Of Information Act ("FOIA") determination by the Office of Naval Research ("ONR") dated February 1, 2005 to Mr. Iver P. Cooper of Browdy & Neimark, P.L.L.C., which resulted in a partial denial of Mr. Cooper's FOIA request dated May 25, 2004. The issues in this appeal have been joined by virtue of ONR's denial letter. Joining of issues prevents consideration on appeal of other exemptions.

For the reasons stated in this appeal, ONR's denial of Mr. Cooper's FOIA request should be overturned and Mr. Cooper's request should be granted in full within the time period prescribed by 32 C.F.R. § 701.12.

We thank you very much for your consideration in this matter.

General Counsel of the N
April 1, 2005
Page 2

Sincerely yours,

James D. Miller

Enclosures

cc:    Mr. Iver P. Cooper
       Mr. Joseph R. Waala

## MEMORANDUM

## I.  ARGUMENT

Mr. Cooper's FOIA request (the "FOIA Request") should be granted in full because FOIA exemption 4 does not apply to the Liu presentation that constitutes the subject matter of the request.  Trade secrets and commercial information can only be protected if they are not deliberately disclosed publicly by their owner.

It is submitted that Professor Liu has made several public disclosures of the relevant information, including, among others: providing, in a publicly-available patent application, copies of figures contained in the slides that made up the presentation; public disclosures in various published scientific articles; disclosure at the presentation that is the subject of the FOIA Request; and public disclosures on Professor Liu's own internet web pages.  In addition, it is submitted that, in addition to these affirmative public disclosures, proper steps have not been taken to maintain any alleged secrecy with respect to the material included in the Coolfont presentation.  As such, Professor Liu, Harvard University, and Ensemble Discovery Corporation may not avail themselves of FOIA exemption 4 to protect the requested materials from disclosure pursuant to this proper FOIA Request.

## II.  BACKGROUND

On May 25, 2004, Mr. Cooper made the FOIA Request to ONR, seeking (1) copies of the presentation by Professor Liu entitled "Unnatural Molecule Evolution" presented at the ONR Biomolecular Science Workshop held in November, 2000 at Berkeley Springs, West Virginia; (2) a copy of the list of participants; (3) a copy of the notice of the conference; and (4) a copy of the application form signed by the participants.

Almost one year after the FOIA Request was originally made, ONR denied the request in part and granted it in part, by a letter dated February 1, 2004 (the "Denial Letter") that was not delivered to Mr. Cooper until February 22, 2005 after repeated requests by Mr. Cooper to have his FOIA Request processed.  See Exhibit A.  In that determination, ONR released only a copy of the list of participants and the first of 30 slides (i.e., the title page) that constituted the presentation by Professor Liu.  The Denial Letter stated that the remaining slides numbered 2 through 30 were withheld "under FOIA exemption 4."  The Denial Letter went on to state, in relevant part:

> Harvard University, Professor Liu and Ensemble Discovery Corporation …
> provided detailed justification for withholding slides 2-30 of that 30 page
> presentation under Exemption 4 … [which] … protects trade secrets and
> commercial … information obtained from a person that is privileged or
> confidential. Information is "confidential" if disclosure is likely to cause
> substantial harm to the competitive position of the person from whom the
> information was obtained. [ONR] has determined that the submitter has
> adequately demonstrated that the information in question constitutes
> commercial information obtained from a person that is confidential…. See
> Exhibit A.[1]

Thus, the stated justification in the Denial Letter for withholding the requested material
was that the Liu presentation constituted commercial information that is confidential
under exemption 4 to the FOIA.

## III.   ANALYSIS

The FOIA generally requires that information held by government agencies be
released to the public upon request. See 5 U.S.C. § 552(b)(4) (2005). In fact, the
Department of the Navy's regulations implementing the FOIA exemptions state: "The
FOIA is a disclosure statute whose goal is an informed citizenry. Accordingly, records
are considered to be releasable, unless they contain information that qualifies for
withholding under one or more of the nine FOIA exemptions." 32 C.F.R. § 701.56
(2005). Exemptions from the disclosure requirements of the FOIA must be narrowly
construed. See, e.g., Washington Research Project, Inc. v. Dep't of Health, Education &
Welfare, 504 F.2d 238, 244 (D.C. 1973), cert. denied, 421 U.S. 963 (1975). Thus, under
the FOIA, there is a heavy presumption in favor of disclosure, and any claimed
exemptions to disclosure must be narrowly construed.

Only exemption 4 is at issue in this appeal. Exemption 4 protects from disclosure
"trade secrets and commercial or financial information obtained from a person and
privileged or confidential matters." 5 U.S.C. § 552(b)(4).[2] In order for exemption 4 to
apply, the records must be confidential or privileged and

---

[1]     It is submitted that Professor Liu is a professor at Harvard University, and has filed a patent
application(s) assigned to Harvard University. It is further submitted that Harvard University has issued
an exclusive license to practice the invention disclosed in the patent application to a small U.S. company
owned by Professor Liu and/or Harvard University, Ensemble Discovery Corporation.

[2]     See also 18 U.S.C. § 1905 (2005) (Trade Secrets Act). For disclosure purposes, these two
statutes are treated as coextensive. See CNA Financial Corp. v. Donovan, 830 F.2d 1132 (D.C. Cir.

General Counsel of the N&
April 1, 2005
Page 5

must contain trade secrets, or commercial or financial records, the disclosure of which is likely to cause substantial harm to the competitive position of the source providing the information.... 32 C.F.R. § 701.59(d) (2005).

## A.    Public Disclosure Of "Commercial Information" Destroys The Protection Of Exemption 4.

Where public disclosure of the information requested has already been made, exemption 4 does not apply to exempt disclosure of information upon a proper request. "To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality -- a sine qua non of Exemption 4." CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1154 (D.D.C. 1987), cert. denied CNA Fin. Corp. v. McLaughlin, 485 U.S. 977 (1988). Thus, for example, information cannot be considered confidential if it is disclosed pursuant to a state filing requirement. See, e.g., CNA Fin. Corp. v. Donovan, 830 F.2d at 1154, n. 153.

In fact, the U.S. Supreme Court has found that "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984). "Secrecy is the most important criterion for information to meet in order to be a trade secret. There are no exceptions to the rule that a trade secret must be 'secret.'" Michael A. Epstein, Epstein on Intellectual Property, at § 1.03, pp. 1-22, 1-23 (4th ed. 1999) (2004 Supp.) (internal citations omitted).

## B.    There Have Been Several Public Disclosures Of The Allegedly "Confidential" Commercial Information, Therefore No Claim To Confidentiality May Be Maintained In Contravention Of The FOIA Request.

Professor Liu, it is submitted, has made several public disclosures of the material that constituted the presentation, including:

---

1987), cert. denied, 485 U.S. Ct. 977 (1988); General Motors Corp. v. Marshall, 654 F.2d 294, 296-97 (4th Cir. 1981); Raytheon Co. v. Dep't of Navy, Naval Air Sys. Command, 1989 U.S. Dist. LEXIS 18281, *5-6 (D.D.C. 1989).

General Counsel of the N...
April 1, 2005
Page 6

(1)     the inclusion of figures in publicly-available patent applications, which figures would appear to be copies of (or at least substantially similar to) the slides that made up the Liu presentation at Coolfont;

(2)     publication of numerous publicly-available scientific articles;

(3)     it is submitted that the Coolfont presentation that is itself the subject of the FOIA Request also constitutes a public disclosure; and

(4)     publicly-available disclosures on Professor Liu's own internet web pages.

In addition, reasonable steps that are necessary to protect any alleged trade secret or confidential commercial information have not been taken.  Exemption 4 therefore cannot apply with respect to this proper FOIA Request, and thus may not be employed to withhold the requested materials.

## 1.     Publicly-Available Patent Applications.

It is believed that publicly-available patent applications submitted by or on behalf of Professor Liu include materials that are, at a minimum, substantially similar to the material in the slides presented by Professor Liu at Coolfont IV, if not identical.  Because the Denial Letter did not provide a detailed justification or explanation of the reasons exemption 4 allegedly applied to the presentation, we request that you please review these materials on an individual basis and make a proper determination.

If, as believed, the material contained in these publicly-available patent applications is the same or substantially similar to the material presented by Professor Liu at Coolfont IV, this operates as a public disclosure of the material and exemption 4 cannot apply to prevent production of this material in response to the FOIA Request. See, e.g., CNA Fin. Corp. v. Donovan, 830 F.2d at 1154.  Secrecy is defeated when a patent issues or the patent application is published.  See, e.g., SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244 (3d Cir. 1985); A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (6th Cir. 1934).

### a.     U.S. Patent Application Number 60/277,094.

Enclosed with this appeal is a copy of a publicly-available U.S. patent application, number 60/277,094, filed by or on behalf of Professor Liu on March 19, 2001 with the United States Patent and Trademark Office.  See Exhibit B.  It is believed that several

General Counsel of the N
April 1, 2005
Page 7

separate slide presentations have been included in this application, one of which is believed to be the presentation made by Professor Liu at Coolfont IV.

Pages[3] 1 through 3 appear to be an introductory section, including the title "Approaches to Generating New Molecular Function." The section beginning on page 4, entitled "Research Overview," appears to contain three separate presentations: (i) the first, entitled "Expanding the scope of protein and nucleic acid evolution," is believed to span pages 5-26; (ii) the second, entitled "Developing amplifiable, evolvable unnatural molecules," is believed to span pages 27-56; and (iii) the third, entitled "Engineering synthetic and biological molecules with new functions," is believed to span pages 57-72.

Page 27 of the second section in the publicly-available patent application described above carries the title "Unnatural Molecule Evolution," which is identical to the title of the presentation Professor Liu gave at Coolfont IV.[4] Accordingly, we believe that pages 27 to 56 -- a total of 30 pages, exactly the same number of slides that made up the Liu presentation -- of this publicly-available patent application contain figures that are at least substantially similar, if not completely identical, to the slides which Professor Liu presented at the Coolfont conference.

### b.     U.S. Patent Application Number 60/306,691.

Also enclosed with this appeal is a copy of publicly-available U.S. patent application number 60/306,691. See Exhibit C. It is also entitled "Approaches to Generating New Molecular Function," and was filed with the United States Patent and Trademark Office by or on behalf of Professor Liu on July 20, 2001. As with the previously discussed publicly-available U.S. patent application, this application includes what appear to be several sets of slides. Page 28 of the slides[5] in the application carries the title "Unnatural Molecule Evolution," which is again identical to the title of Professor Liu's slide presentation at Coolfont IV.[6] We believe that this publicly-available patent application, much like the one discussed above, contains information that is substantially similar, if not completely identical, to that contained in the Coolfont presentation.

---

[3]     We refer to the page numbering added by hand in the publicly-available patent application.

[4]     See Exhibit A (Slide 1 of the presentation).

[5]     Again, we refer to the hand-numbered section of the application.

[6]     See Exhibit A (Slide 1 of the presentation).

General Counsel of the N.
April 1, 2005
Page 8

### c.    U.S. Patent Application Number 60/277,081.

In addition to the first U.S. patent application discussed above (number 60/277,094), another U.S. patent application, which is now publicly-available, was filed by or on behalf of Professor Liu on the same date and was assigned the official application number 60/277,081.  See Exhibit D.  We believe it is highly likely that this application also contains some of the same figures or disclosure as the slides in Professor Liu's Coolfont IV presentation.

### d.    PCT Application Number WO 02/074929 A2 and Other Publicly-Available Patent Applications.

The above-mentioned U.S. patent applications are all publicly available, and have been publicly available since the time of publication of a PCT application[7] claiming a right to priority with respect to all of the above-mentioned patent applications. Publication of the PCT application, number WO 02/074929 A2, took place on September 26, 2002.  See Exhibit E, at Tab 1.[8]

We request that the slides from Professor Liu's Coolfont presentation be compared to the information contained in these publicly-available patent applications on an individual basis.  Each slide and figure, as well as the written disclosure itself in the patent applications, should be reviewed individually against any of the slides presented by Professor Liu at the Coolfont presentation.  If any of the information contained in the slide presentation at Coolfont is at least substantially similar to the contents of any of the patent applications, then the material from the presentation must be treated as publicly disclosed, and exemption 4 to the FOIA cannot justify not producing the material pursuant to the proper FOIA Request.  See, e.g., CNA Fin. Corp. v. Donovan, 830 F.2d at 1154.

### 2.    Publication Of Materials Presented At The Coolfont Conference.

It is submitted that Professor Liu has publicly discussed the subject matter of his Coolfont presentation in several publicly-available written publications.  See Exhibit F. We request that an individualized review of these materials be conducted to determine

---

[7]    A PCT application, generally speaking, is an "international" patent application filed under the Patent Cooperation Treaty (the "PCT").

[8]    Exhibit __ also contains information related to other publicly-available patent applications filed for Europe and in the United States.

whether any of the material from the presentation has been disclosed in these published articles. If it has, then exemption 4 cannot be claimed to withhold the materials in contravention of Mr. Cooper's FOIA Request.

### 3.    Public Disclosure At The Coolfont Conference.

The presentation standing alone constituted a public disclosure of the materials and thereby vitiates any claim to secrecy, for several reasons. First, attendees at the presentation were not required to sign non-disclosure agreements with respect to materials presented at the conference. Second, "Gordon Conference rules," which prohibit formal publication of conference materials, do not apply to the Coolfont conference. Third, even if Gordon Conference rules did apply to the Coolfont conference, these rules only apply with respect to formal publication of material disclosed at a conference, and such a limited prohibition is insufficient to protect a trade secret or commercial information from public disclosure.

#### a.    Conference Attendees Were Not Required To Sign Confidentiality Agreements.

Participants at the Coolfont IV Conference included at least fifty-five participants, most of whom were not ONR employees or officials. See Exhibit A (page entitled "Coolfont Attendance"). There is no evidence that conference participants signed any non-disclosure agreements to maintain secrecy (for example, as part of their application for attendance).[9] In fact, Dr. Harold Bright, who administered the conference on ONR's behalf, advised Mr. Cooper that there was no documentation with respect to any nondisclosure agreement. See Exhibit G (Declaration of Mr. Cooper). Without signing a formal agreement, participants are free to discuss materials presented at the conference. At most, participants were orally and unilaterally informed that the conference was under "Gordon Conference Rules." See id.

As discussed in (b) below, this alone is insufficient to hold attendees subject to any non-disclosure rules. Moreover, as discussed in (c) below, even if such rules did apply, there is still no bar to any informal disclosure of conference material, and therefore no legitimate claim to secrecy.

---

[9]    According to the Denial Letter, "a thorough search was conducted [for copies of any notices or application forms of the Coolfont Conference], and no documents were found that respond." See Exhibit A.

General Counsel of the N;
April 1, 2005
Page 10

> **b.      Conference Attendees Were Not Subject To Any Rules
> Purporting To Limit Discussion Of Materials Presented At The
> Conference.**

No evidence has been presented to demonstrate that attendees at the Coolfont
conference were subject to "Gordon Conference rules." Gordon Research Conference
rules generally prohibit the formal publication by members of the organization or
attendees at such a conference of material disclosed at their conferences. The Gordon
Research Conference is an organization that describes its mission as follows: "[to]
provide an international forum for the presentation and discussion of frontier research in
the biological, chemical, and physical sciences, and their related technologies. <u>See</u>
Exhibit H (Document entitled "What is GRC?").[10]

It is submitted that the Coolfont conference was not a "Gordon Research
conference." No mention of the Coolfont IV conference has been found in any Gordon
Research Conference materials.[11] In fact, a search of the Gordon Research Conference
website, which includes information on past conferences, found no mention of the
Coolfont IV conference. Moreover, all applications for attendance and registration forms
for a Gordon Research conference generally include the written disclaimer (discussed
below) regarding publication of Gordon Conference material, yet no records of any
attendance forms or notices have been produced pursuant to Mr. Cooper's request.[12] Mr.
Bright, who oversaw the conference on behalf of ONR, has in fact stated that there was
no such documentation. <u>See</u> Exhibit G.

Even if ONR intended to follow Gordon Conference rules, it clearly did so only
piecemeal. It did not put the standard Gordon Conference statement into the application
for membership. It did not make registrants sign any commitment to secrecy. Hence,
even if it told registrants that the conference was under "Gordon Conference rules," it is

---

[10]      The Gordon Research Conference "Mission Statement" may be found at the following internet
address: http://www.grc.org/whatis.htm.

[11]      <u>See</u>, <u>e.g.</u>, the official Gordon Research Conference web site, which may be found at the following
internet address: http://www.grc.org/. The web site includes a searchable database with information on
past conferences for years including 2000, when the Coolfont IV conference was held. The search page
may be found at the following internet address: http://search.freefind.com/find.html?id=77674883.

[12]      Again, according to the Denial Letter, "a thorough search was conducted [for copies of any
notices or application forms of the Coolfont Conference], and no documents were found that respond."
<u>See</u> Exhibit A.

unclear what attendees understood that to mean. Moreover, a unilateral and belated remark by ONR cannot be considered legally binding on the registrants.

There is no reason to hold conference attendees subject to Gordon Conference rules, absent a signed confidentiality agreement. No such agreements have been produced and it is submitted that none exist. Therefore, these rules prohibiting formal disclosure should not apply with respect to the Coolfont presentation.

> **c.**    **Even If Attendees Were Subject To Gordon Conference Rules, Those Rules Only Prohibited Formal Publication Of Conference Material, Not Informal Discussion With Others, Therefore Those Rules Cannot Prevent The Escape Of Information Into The Public Domain And Cannot Maintain Disclosed Information As A Trade Secret.**

Gordon Conference restrictions on dissemination apply only with respect to <u>formal</u> publication of conference material, not to all forms of disclosure, and this is insufficient to protect the materials from disclosure. Attendees are allowed to discuss materials presented at a Gordon conference. The only non-disclosure requirements to which attendees may be subject include prohibitions on recordation of presentations and formal publication of materials:

> An essential part of the Gordon Research Conferences format is that all discussions are informal and off-the-record. No information presented at a Gordon Research Conference is to be used without the specific authorization of the individual making the contribution, whether the contribution is in a formal presentation, discussion or poster presentation. Publications are not to be prepared as emanating from Gordon Research Conferences.

> The application for membership in a Conference contains the following statement: "<u>The recording of lectures by tapes etc. and the photography of slide materials are prohibited. Printed references to the Gordon Research Conference papers and discussion are not permitted.</u> Authors are requested to omit references to the Conferences in any publication. Guests are not permitted to attend the Conference lectures and discussion sessions."

> Each person registering for a Gordon Research Conference is required to sign the following statement: "<u>The recording of lectures by tapes, etc. and the photography of slide materials are prohibited. Printed reference to</u>

> Gordon Research Conference <u>papers and discussion is not permitted</u>.
> Authors are requested to omit references to the Conference in any
> publication. Guests are not permitted to attend the Conference lectures and
> discussion sessions. Each member of the Conference agrees to these
> regulations when registration is accepted." Exhibit I (Gordon Research
> Conference "Guidelines Concerning Publication and Press Participation")
> (emphasis added).[13]

The Gordon Research Conference bylaws state:

### SECTION 1. TECHNICAL PUBLICATIONS

> <u>There shall be no publication of information disclosed at a conference or a
> related meeting without written approval</u> from both the contributor quoted
> and the Director, <u>except where the contributor initiates release</u> of a
> contribution, in which case the approval of the Director is not required. <u>See</u>
> Exhibit J (emphasis added).[14]

These Gordon Conference restrictions on use, recordation, and formal publication
are insufficient to maintain a trade secret, because they do not prevent public discussion
of information obtained at a Gordon Conference. Attendees are still free to discuss
material presented at a conference in an informal manner. In fact, it is submitted that
even if the rules were applicable to informal discussion, Professor Liu has, by virtue of
his many public disclosures of the requested material, already "initiate[d] release of a
contribution, in which case the approval of the Director is not required." <u>See</u> <u>id.</u>

The presentation, standing alone, thus operated as a public disclosure, and
prevents application of exemption 4 to withhold these materials in contravention of Mr.
Cooper's FOIA Request.

    4.    **Public Disclosure On Internet Web Pages.**

---

[13]    The Gordon Research Conference "Guidelines Concerning Publication and Press Participation"
may be found at the following internet address: http://www.grc.uri.edu/advice/press.htm. The Gordon
Research Conference applications for attendance may also be found at the following internet address:
http://www.grc.org/application/apply1.cfm.

[14]    The Gordon Research Conference bylaws may also be found at the following internet address:
http://www.grc.org/law/law.htm.

General Counsel of the N.
April 1, 2005
Page 13

It is also submitted that Professor Liu has publicly discussed the subject matter of the presentation on his own internet web pages. See Exhibit K (Affidavit of Internet Archive Officer; curriculum vitae ("CV") of Professor Liu; and Harvard internet homepage of Professor Liu).

The web pages enclosed include archived copies of Professor Liu's CV published on the internet as of various dates. The archived pages of the CV found at Tabs 3 through 8 (spanning the time period February 15, 2001 to November 30, 2001) all list the fact that he had made a presentation entitled "Unnatural Molecule Evolution" at Coolfont IV. See id. (Pages 2-3 of the CV). One would not normally do so if one believed the presentation to be a "trade secret." Also enclosed is a copy of Professor Liu's Harvard University homepage, in which Professor Liu provides a research overview that discusses his work in "Amplifiable and Evolvable Unnatural Molecules." It is submitted that this discussion also involves material that was included in the Coolfont presentation.

We request that an individualized review of these enclosed materials be conducted to determine whether any of the material from the presentation has been disclosed on the Harvard University website. If it has, then exemption 4 cannot be claimed to withhold the materials in contravention of Mr. Cooper's proper FOIA Request.

5.    **In Addition To Affirmatively Making The Several Public Disclosures, Professor Liu, Harvard University, And/Or Ensemble Discovery Corporation Have Not Taken The Proper Steps Necessary To Maintain Any Alleged Secrecy.**

It is also submitted that the parties claiming secrecy did not take reasonable precautions to maintain the secrecy of the Coolfont presentation. "A trade secret owner must take affirmative measures to safeguard the information claimed to be a trade secret. There are no exceptions to this rule." Epstein on Intellectual Property, at § 1.03, p. 1-26 (citing Hoffmann-La Roche Inc. v. Yoder, 950 F. Supp. 1348, 1360 (S.D. Ohio 1997) (no presumption that information is a trade secret and no relief can be granted unless the possessor takes active steps to maintain its secrecy); Weins v. Sporleder, 569 N.W. 2d 16 (S.D. 1997), cert. denied, 531 U.S. 821 (2000) (relief denied where plaintiff failed to demonstrate active measures taken to maintain his product's secrecy)).

Several guidelines have been proffered in this respect, including: memorializing a secrecy policy in writing, informing employees of trade secrets, restricting access to trade secrets, labeling trade secret documents as confidential, and, most importantly for these purposes, screening speeches and publications. See generally Epstein on Intellectual Property, at § 1.03, pp. 1-27 to 1-38 (internal citations omitted). "A company must

General Counsel of the N
April 1, 2005
Page 14

eliminate disclosure of trade secret information at trade shows, in magazine articles, publications … and during public speeches." Id. at p. 1-38.

We ask that you review the materials to determine if such precautions were taken. For example, were the figures contained in the slides marked "confidential," or did they bear some other legend demonstrating a desire to obtain trade secret protection? Was this information stored separately from other non-confidential documents? Were Harvard University employees required to sign confidentiality agreements? Did Harvard University make employees aware of any confidentiality obligations?

If the answer to some or all of these questions is "no," we submit that the materials cannot be maintained as a trade secret. Taken in conjunction with the presentation of the materials at a conference in which attendees were not subject to any confidentiality agreements, this demonstrates that reasonable steps were not taken to maintain the secrecy of any purported "trade secrets," and the materials cannot be exempted from disclosure under the FOIA.

Because of the public disclosures of the requested material, and the failure of the parties to maintain any alleged secrecy with respect to the requested material, exemption 4 cannot rightfully be claimed to prevent disclosure of the material to Mr. Cooper pursuant to his proper FOIA request.

## IV.    CONCLUSION

For the reasons set forth above, ONR's denial of the FOIA Request should be overturned and the request granted in full, and copies of the slides numbered 2-30 of Professor Liu's Coolfont presentation, a copy of the notice of the conference, and a copy of the application form signed by the participants should be provided to Mr. Cooper within the time period prescribed by 32 C.F.R. § 710.12.



REC'D 0 4 JUN 2002

WIPO        PCT

P1 814916

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**May 28, 2002**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE OF THOSE PAPERS OF THE BELOW IDENTIFIED PATENT APPLICATION THAT MET THE REQUIREMENTS TO BE GRANTED A FILING DATE.

**APPLICATION NUMBER:** *60/277,094*
**FILING DATE:** *March 19, 2001*
**RELATED PCT APPLICATION NUMBER:** *PCT/US02/08546*



COMMISSIONER OF PATENTS AND TRADEMARKS

*M. Tarver*

**M. TARVER**
**Certifying Officer**

## PRIORITY
## DOCUMENT
SUBMITTED OR TRANSMITTED IN
COMPLIANCE WITH RULE 17.1(a) OR (b)



03-20-01

APROV

# CHOATE, HALL & STEWART

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

EXCHANGE PLACE

53 STATE STREET

BOSTON, MASSACHUSETTS 02109-2891

TELEPHONE (617) 248-5000

FACSIMILE (617) 248-4000

Date:  March 19, 2001          EXPRESS MAIL NO. EL603010365US

**This is a request for filing a PROVISIONAL PATENT APPLICATION under 37 CFR 1.53(b)(2)**

BOX PROVISIONAL APPLICATION
COMMISSIONER FOR PATENTS
WASHINGTON, DC  20231

Sir:

| | | | 0342941-0053 | Type a plus sign (+) inside this box → | + |
|---|---|---|---|---|---|
| **INVENTOR(s)/APPLICANT(s)** | | | | | |
| *Last Name* | *First Name* | *Middle Initial* | *Residence (City and either State or Foreign Country)* | | |
| Liu | David | R. | Lexington, MA | | |
| **TITLE OF INVENTION (288 characters max)** | | | | | |
| APPROACHES TO GENERATING NEW MOLECULAR FUNCTION | | | | | |
| **CORRESPONDENCE ADDRESS** | | | | | |
| CHOATE, HALL & STEWART, Exchange Place, 53 State Street, Boston, MA  02109 | | | | | |
| *State* | Massachusetts | *Zip Code* | 02109 | *Country* | U.S. |

3235298_1.DOC

| ENCLOSED APPLICATION PARTS | | | | | |
|---|---|---|---|---|---|
| | Specification | Number of Pages | ☒ | Small Entity Statement | 2 |
| ☒ | Drawing(s) | Number of Sheets 14 | | Other (specify) Abstract of the Disclosure | |

| METHOD OF PAYMENT (check one) | | | | | |
|---|---|---|---|---|---|
| ☒ | A check or money order is enclosed to cover the Provisional Filing Fee. | | | | |
| ☒ | The Commissioner is hereby authorized to charge filing fees under our Deposit Account Number | 03-1721 | | PROVISIONAL FILING FEE AMOUNT ($) | $75 |

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government

☒    No
☐    Yes; the name of the U.S. Government agency and the Government Contract Number are:

_____

_____

Respectfully submitted,

C. Hunter Baker, M.D., Ph.D.
Registration Number 46,533

3235298_1.DOC



# Approaches to Generating New Molecular Function

- Classic chemical approach:

- Nature's approach:





## How Do Molecules Evolve?

- Evolution requires *diversification, selection, amplification*
- Nature evolves molecules in one pot, parallel reactions

- Presently we can only evolve two types of molecules in this manner—proteins and nucleic acids— because only these molecules can be amplified in one pot

1) DNA polymerase
2) RNA polymerase, ribozyme

DNA or RNA polymerase

- 3 -



# Research Overview

I. Expanding the scope of protein and nucleic acid evolution

II. Developing amplifiable, evolvable unnatural molecules

III. Engineering synthetic and biological molecules with new functions



Expanding the Scope of Nucleic Acid and Protein Evolution

- Evolving enzymes that manipulate proteins and nucleic acids
- Ligase-mediated random recombination
- Evolving protein-RNA complexes



## Natural Molecule Evolution

- Genetic methods have proven to be extremely powerful in evolution of proteins and nucleic acids

Challenge: link the survival of encoding information to the creation of solutions to chemical problems of interest

starting + active → chemical → product → cell
material   catalyst    reaction              survival

+ inactive →           no
  catalyst             product

~ 6 ~



# Homing Endonucleases

- Unlike restriction endonucleases, "homing endonucleases" recognize and cleave very long sequences of DNA

    5'-TAGGATAACAGG...AT-3'
    3'-ATCCTATTGTCC...TA-5'

    I-Sce I homing
    endonuclease
    →

    5'-TAGGATAA3'    5'-CAGGGTAT-3
    3'-ATCC5'    3'-TATTGTCCCATTA-5

- <1 in 10^10 cleavage frequency makes their evolution feasible

Cre-I homing endonuclease





-9-





# Comprehensive Characterization of DNA Manipulating Enzymes

• Genomics-based strategies may profile the substrate specificity and kinetics of DNA-binding proteins in a highly efficient fashion

recombined sequences leave holes in the fluorescent landscape

incubate with evolved recombinases

array of potential lox sites flanking fluorescent labeled DNA

$lox^p$ $lox^p$

# Conditionally Active Proteins

- Any general positive and negative selection can be used to evolve conditionally active enzymes

- Target conditions for protein activation:
  - High or low temperature
  - Redox potential
  - Metal ion concentration
  - Small molecule concentration
  - Post-translational modification

- Study the mechanistic basis of allostery and conformational change



negative selection
standard conditions

positive selection
target conditions



Inteins:

- Protein self-splicing: a natural post-translational process

elf-Splicing Protein Introns

*GyrA intein*



# Evolving Ligand-Activated Inteins

- Reveal the structural and functional requirements of protein splicing

- Evolve conditionally active intein variants for examining biological phenomenon through rapid protein activation or inactivation

- Define the requirements for an allosteric binding site in a protein





# Ligase-Mediated Recombination... New Methods for Nucleic Acid Evolution



(W. Stemmer et al.)

extract DNA

PCR with primers

transform cells

- *In vitro* homologous recombination has revolutionized protein evolution

- Random recombination has never been used to evolve nucleic acids

- Random nucleic acid pools have ~zero homology

- Evidence suggests that *nonhomologous recombination* can be critical for optimally searching sequence space



# Ligase Mediated Random Recombination (LMRR)

pool of genomic or random starting DNA

↓ DNase I, Mg++

nicked DNA fragments

↓ T4 DNA polymerase

blunt ended DNA fragments

1-5 mol% hairpin DNA

↓ T4 DNA ligase, 15% PEG

recombined DNA oligomers

↓ digest with SmaI

ds DNA "recombinons"

↓ error-prone PCR

amplified, mutated "recombinons"

↓ denature (or T7 RNA polymerase)

1. bind to ligand-resin
2. elute with free ligand

selected DNAs or RNAs

↓ PCR, digest with BspEI and BclVI

amplified selected DNA

repeat ←

Clone into plasmid for sequencing and characterize







# Successful Nonhomologous Random Recombination

- Subject two parental DNAs to a single round of LMRR (10-50 bp fragments recombined into 80-200 bp):

# Successful Nonhomologous Random Recombination

- Subject two parental DNAs to a single round of LMRR (10-50 bp fragments recombined into 80-200 bp):

**Mom**                                              **Dad**

CCAGAGTTTAGGTAGGG...TTTTATAGCACTAAATGCCC     GGATAGA...
ACTAGAGAAAGCAGGAG...ATCCAAAATCCAAAACTTA      AGGGCCCTTGAGGTTTGCATAGTTCTTGATGTGGAATA
AACATAA                    AGCTGTTC          TTTGTGTGTCCTGATAGAATTTACAAGGGGAATTCT
GCCCATCACTGGATCCC...CCTTATCAAAACACATTTAA     TGAAGACGAAAGGGCCTCGTGATACGCCTATTTTATAG
GCTTAGTCCCCGGAATT...TGAAGACGAAAGGGCCTCG      GTTAATGTCATGATAATAATGGTTTCTTAGACGTCAGGT
TGATACGGCTATTTTAT...GTTA                     GG                         AGTCAGGC
Daughter A    AGGGCC     CCACCTGACGTCT                                   CTTGAAGACGAA
              ...TG

**Mom**                                              **Dad**

CCAGAGTTTAGGTAGGG...ATTTATAGCACTAAATGCCC    CGATAGAAAGAAAGAAAAGGAAAGGCAGTCAGGC
ACTAGAGAAA                                  AGGGC                  GTTCTTGAATGTGGAATA
ATAACAATAACAAA...AAAATTAGTGTGTAGCTGTTC      TTTGTGTGTCCTGATAGAATTTACAAGGGGAATTCT
GCCCATCACTGGATCCC...CCTTATCAAAACACATTTAA    TGAAGACGAAAGGGCCTCGTGATACGCCTATTTTATAG
GCTTAGTCCCGGGAAT...GTTA                     GTTAATGTCATGATAATAATGGTTTCTTAGACGTCAGGT
    CGCCTATTTTTAT...TTCTTG                   GG                  ACACACTAATTTCTTTGGTTATTGT
Daughter B    TTCTTG...TTGGAATATTTGTG



# Targets for Nucleic Acid Evolution by LMRR

- Compare side-by-side LMRR with SELEX and error-prone PCR

- DNA-based biotin mimetic

- DNA-based α-Gal receptor (bind α-Gal, wash with other oligosaccharides, elute with free α-Gal) [C. Bertozzi]



# Targets for Nucleic Acid Evolution by LMRR

- Compare side-by-side LMRR with SELEX and error-prone PCR

- DNA-based biotin mimetic

- DNA-based α-Gal receptor (bind α-Gal, wash with other oligosaccharides, elute with free α-Gal) [C. Bertozzi]

- DNA-based Diels-Alderase

# Biopolymeric Alchemy: Defining the Scope of Catalysis

- What is the catalytic scope of a biopolymer?
- How can the scope of RNA catalysis be expanded?
- Can unnatural RNA receptors and catalysts be evolved *in vivo*?
- Can we evolve protein-RNA complexes?
- Evolve stepwise a catalytic RNA from a protein catalyst



-23-



# Linking RNA and Protein *In Vivo*

- MS2 coat protein binds a 21 base RNA hairpin with low pM affinity

- Translationally fuse the protein of interest to the MS2 coat protein

- Transcriptionally fuse the RNA library with the MS2 RNA hairpin



Targets for Biopolymeric Alchemy

- Chorismate mutase

- Dihydrofolate reductase

- Chorismate mutase *in vivo* selection works in the MS2 system

# Evolving RNA Modulators of Protein Activity

- Major barrier to developing ligands to a specific protein: loss of entropy upon combining two molecules

- Overcome with the enthalpy of MS2 coat protein binding to its cognate RNA

- Express protein target as an MS2 fusion

- Evolve an RNA that activates or represses the protein's function by in vivo screen or selection

- Remove the MS2 "crutch"

-26-



# Unnatural Molecule Evolution

- Unnatural biopolymers
- Unnatural small molecules
- Unnatural bulk materials

-27-

# Developing Amplifiable, Evolvable Unnatural Molecules

- How can we marry synthetic chemistry and genetic methods?

- Amplification of a molecule = information amplification + translation of information into structure

- Ribosome: a 3,000,000 D complex to translate information into protein that

- Approach: to develop evolvable unnatural molecules, devise molecular architectures to translate DNA into *unnatural*



# Architectures for Unnatural Molecule Translation

# Architectures for Unnatural Molecule Translation







# Physical Organic Considerations

- Reaction geometries:
  - What diversity of reaction geometries is tolerated?

- Specificity:
  - How much faster is the                reaction of DNA-templated synthesis compared with                reactions?
  - What is the rate of reaction of reactants with mismatched DNA?

- Reaction conditions:
  - What powerful synthetic reactions are compatible with DNA and water?

- Amplification:
  - Can small numbers of molecules of DNA be amplified by PCR?

-32-



# Rxn Geometries and Specificity

Architecture:
Reagent:

*1:1 reagent:template, aqueous 50 mM MOPS pH 7.5, 250 mM NaCl, 25 °C*

H prod. →
E prod. →

1 min     5 min     10 min     20 min

- Both architectures support sequence-specific DNA-templated synthesis, with no observable intermolecular product formation



# Diverse Reaction Geometries

Matched (M) or mismatched (X) reagents with thiol (S) or amine (N) nucleophile

Hairpin (H) or end-of-helix (E) templates







# Temperature Effects on Specificity

$T_m \sim 37°C$

50 mM MOPS pH 7.5, 60 nM reactants,
250 mM NaCl, 16 hours

- Single mismatch reaction can be eliminated by elevating temp.
- Intermolecular reaction does not take place under these conditions

# C-C Bond Formation in Water

- Many powerful complexity-building reactions are water-compatible

- Often $\Delta V^{\ddagger} < 0$; accelerates reactions in water (hydrophobic effect)



# C–C Bond Formation in Water

- Many powerful complexity-building reactions are water-compatible
- Often $\Delta V^{\ddagger} < 0$ (accelerates reactions in water (hydrophobic effect)



# DNA-Templated C-C Bond Formation



p$K_a$ of α-proton ~9.5

mM MOPS pH 7.5-11, 60 nM reactants, 25 °C, 16 h

- Preliminary results are consistent with DNA-templated aldol rxn
- Lewis acids (e.g., InCl₃) may improve yields



# DNA-Templated Synthesis Exhibits
## Surprising Distance Independence

10 min, 25 °C, 1:1 template:reagent

- Hairpin templates with $S_N2$ reaction yield similar results
- Contrasts with the notorious difficulty of macrocyclization

-41-



Does the DNA Backbone Structure Induce Distance Independence?



# Does the DNA Backbone Structure Induce Distance Independence?

- Flexibility of the intervening region is required
- A precise backbone structure, charge state, or hydrophobicity is not required for distance-independent DNA-templated synthesis



# Basis of Distance Independent DNA-Templated Synthesis

- Although templated reactions are pseudo-intramolecular, observed rate is concentration dependent!

- DNA-templated format can accelerate reactions such that annealing, rather than chemical reaction, is rate-determining

- Implications for prebiotic evolution, nucleic acid catalysis

-44-









# Identification of Molecules Selected From a Synthetic Library

Biotin template contains *Tsp*-45 I site; other templates do not.

- 1,000-fold enrichment of DNA encoding a synthetic molecule from one round of translation, selection, and PCR amplification





# Reagent Linker Development

1) Linkers cleaved after reaction

2) Linkers cleaved as a chemical consequence of the reaction



# Small Molecule Diversification and Evolution

- DNA-templated library synthesis may enable the amplification and evolution of small molecules

- Genetic codes written to assign DNA codons to functional groups

- Selected small molecules can be diversified by mutagenesis or recombination using restriction enzymes and DNA ligase



Cephalosporin Recombination

# A Biological Approach to Small Molecule Library Synthesis

| Traditional Methods | DNA-Templated Synthesis |
|---|---|
| ~ 0.3 M | ~ 100 nM |
| driven by intermolecular reactivity and PGs | sequence-specific single intramolecular reaction; may reduce PG needs |
| ~ 1-100 mg per member, 100 mg-grams per library | ~ 0.001-1 ng per member, 0.1-10µg per library |
| typically high (mgs) | only enough to yield several molecules after selection |
| resynthesis *after* identification | mutation & recombination *without* identification |
| one-pot screens or selections must be deconvoluted in pools | molecules are selected in one pot on the basis of a *single* molecule's properties |
| tagging, deconvolution, direct methods | DNA sequencing |
| commerically available | |

-52-

# Evolving Plastics

- How can amplifiable information be translated into materials with specific properties (e.g., plastics)?

- Nucleic acids can fold into complex structures



react → select polymers → PCR amplify

- Requirements:
  - Linkage between information and product: need living polymerization
  - Selection for desired materials: gel electrophoresis; sedimentation, mechanical sorting, solvent partitioning
  - Chemical compatibility with DNA: stability in water

-53-

# Evolving Plastics

- Ring-opening metathesis polymerization (ROMP, R. Grubbs) is mediated by ruthenium catalyst

- ROMP is aqueous-compatible and is a living polymerization

# Evolving Snot

- Ring-opening metathesis polymerization (ROMP, R. Grubbs) is mediated by ruthenium catalyst
- ROMP is aqueous-compatible and is a living polymerization

# Evolving Snot-Like Plastics

- Ring-opening metathesis polymerization (ROMP, R. Grubbs) is mediated by ruthenium catalyst

- ROMP is aqueous-compatible and is a living polymerization

- Initial selections for evolving ROMP plastics:

# Engineering Synthetic and Biological Molecules With New Functions

- A universal transcription factor
- Sequence-specific DNA sensors
- Developing DNA binding small molecules